FILED

2014 May-21  PM 01:39
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| BLACK WARRIOR RIVERKEEPER, INC., et al., | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 2:13-CV-02136-WMA |
| v. | ) ) | |
| U.S. ARMY CORPS OF ENGINEERS, et al., | ) ) ) | |
| Defendants. | ) ) | |
| THE ALABAMA COAL ASSOCIATION, et al., | ) ) ) | |
| Intervenor-Defendants. | ) | |

## MEMORANDUM OPINION

Plaintiffs instituted this action to challenge the 2012 reissuance of Nationwide Permit 21 ("NWP 21"), a five-year general permit issued pursuant to the Clean Water Act, 33 U.S.C. § 1344(e) ("CWA"). NWP 21 authorizes surface coal mining operations to discharge dredged or fill material into waters of the United States if the operations meet certain requirements. In the 2012 version of NWP 21, the requirements differ for operations that were authorized under the previous general permit. Plaintiffs claim that the different requirements for previously authorized operations violate the CWA and the National Environmental Policy Act, 42 U.S.C. §§ 4321-47 ("NEPA"), and that defendants' issuance of 2012 NWP 21 with this provision violates the Administrative Procedure Act, 5 U.S.C. §§ 701-06 ("APA").

Three motions are before the court: plaintiffs' motion for

summary judgment, Doc. 45; defendants' motion for summary judgment, Doc. 63; and intervenors' motion to dismiss for lack of subject matter jurisdiction or, in the alternative, motion for summary judgment, Doc. 65.  For the reasons stated below, the court will deny intervenors' motion to dismiss and plaintiffs' motion for summary judgment, but will grant defendants' and intervenors' motions for summary judgment.

## BACKGROUND

The parties acknowledge that this case rests primarily on the administrative record, and they do not dispute the underlying material facts.  Those facts, centering on plaintiffs' standing, and the administrative framework are detailed below.

## I.   Facts Related to Standing

Plaintiff Black Warrior Riverkeeper, Inc., ("Riverkeeper") is a nonprofit corporation dedicated to protecting and restoring the Black Warrior River and its tributaries.  Plaintiff Defenders of Wildlife ("Defenders") is a nonprofit organization dedicated to protecting native wild animals and plants and to preserving their natural habitats.  Plaintiffs' standing to bring suit depends on, *inter alia*, the interests of their members. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).  Intervenors do not dispute the factual allegations supporting plaintiffs' members' interests, only whether those allegations satisfy the requirements of standing.

Plaintiffs' members[1] use and enjoy waters downstream from surface mine sites in the Black Warrior River watershed. Docs. 9-12 to 9-18; Howell Dep. 47:12-19; 48:4-7.  Their activities include swimming, eating fish caught in the water, and studying organisms that live in or near the water.  Plaintiffs' members have personally observed that water downstream from the mine sites has impaired water quality.  *E.g.,* Brooks Dep. 57-56 (observed "[dis]colored water coming out of the mine" that "didn't look that way upstream of the discharge point").  Water downstream from the mine sites also appears clouded with stirred-up sediment and silt.  This impaired water quality decreases plaintiffs' members' aesthetic and recreational enjoyment, reduces their opportunities to observe wildlife, and causes them concern about ingesting the water and fish caught in the water.

## II.  Administrative Framework

Plaintiffs claim that paragraph (a) of the 2012 reissuance of Nationwide Permit 21 violates the CWA, the NEPA, and that defendants' conduct in issuing 2012 NWP 21 violates the APA.  This section describes the roles of the CWA and the NEPA in defendants' issuance of a nationwide general permit and reviews the specific provisions of NWP 21.

---

[1] Randy Palmer, Mark Bailey, Sam Howell, Stephen Guesman, and Cindy Lowry are members of Riverkeeper. Docs. 9-12, 9-13, 9-16, 9-17, 9-18.  Nelson Brooke and Mark Johnston are members of both Riverkeeper and Defenders. Docs. 9-14, 9-15.

**Clean Water Act**

Defendant the United States Corps of Engineers ("Corps") may authorize discharge of pollutants under the CWA by issuing either individual or general permits. 33 U.S.C. § 1344. Individual permits require site-specific documentation and analysis, while a general permit authorizes all activities that fall under its conditions without the need to obtain separate authorization. *Id.* The present case concerns a general permit.

The Corps may issue general permits for a period of no more than 5 years on a state, regional, or nationwide basis after public notice and opportunity for hearing. *Id.* at § 1344(e). The Corps may authorize a general permit only if it determines that the activities at issue "will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effects on the environment." *Id.* The cumulative effects analysis required by this provision has a national level and a local level. At the national level, the Corps first analyzes more than 15 different factors that could be affected by a general permit. 40 C.F.R. § 230. Based on this analysis, the Corps makes a written determination of the effects of a proposed activity, which the Corps includes in a Decision Document. *Id.* at § 230.11. At the local level, the district engineer evaluates the general permit from a regional perspective and prepares a Supplemental Decision Document, which can modify, suspend, or revoke the permit in that region. 33 C.F.R. § 330.4(e)(1). The district engineer may

use his or her discretion to require mining activities to proceed under individual permits if those activities would have more than minimal adverse environmental effects in a particular region.

**National Environmental Policy Act**

Before issuing a general permit, the Corps must conduct two analyses pursuant to the NEPA: a public interest analysis and a cumulative effects analysis.[2] 33 C.F.R. §§ 320.4(a)(1)-(2), 330.5(a)(3). Plaintiffs focus on the cumulative effects analysis.

NEPA regulations define cumulative effects as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (federal or non-federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. The Corps analyzes the cumulative effects of a general permit in an Environmental Assessment ("EA"). *See id.* at § 1501.4. Depending on whether the EA indicates that the general permit will significantly affect the environment, the Corps either continues its analysis with the more detailed Environmental Impact Statement ("EIS") or issues a Finding of No Significant Impact. *See id.* at §§ 1501.4, 1508.13. Most, if not all, activities covered by a general permit require only an EA because the threshold for authorizing

---

[2] NEPA regulations use the words "impacts" and "effects" synonymously. 40 C.F.R. § 1508.8; *see also Ky. Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402, 408 n.2 (6th Cir. 2013). For consistency, the court uses "cumulative effects analysis" for both the NEPA and the CWA.

general permits-—having minimal adverse environmental effects-—
falls short of the threshold that triggers an EIS-—"major federal
action significantly affecting the quality of the human
environment." Doc. 63-5, NWP002722.

**Nationwide Permit 21**

NWP 21 allows surface coal mining operations to discharge
certain dredged or fill material into waters of the United States.
The Corps issued revised versions of NWP 21 in 2007 and 2012. The
2007 version did not include any limits on the length of streams
that could be filled. 72 Fed. Reg. 11092 (Mar. 12, 2007). The
Corps gave public notice of proposals regarding NWP 21 in the
Federal Register on February 16, 2011. Riverkeeper submitted its
comments on NWP 21 in a letter dated April 18, 2011, including its
objections to Option 2, which the Corps eventually issued as 2012
NWP 21. *See* NWP024264-NWP024279. Defenders submitted its comments
in a letter on the same date and objected to multiple general
permits under the CWA, although not NWP 21 specifically. *See*
NWP023613-NWP023631, NWP024458-NWP024476 (duplicate). The 2012
version was issued on February 18, 2012, and became effective March
19, 2012. 77 Fed. Reg. 10184, 10184 (Feb. 21, 2012). Paragraphs
(a)[3] and (b) of 2012 NWP 21 divide activities into two types and

---

[3] Plaintiffs call 2012 NWP 21(a) the "grandfather provision" based on the preamble to the Federal Register Notice for 2012 NWP 21. Doc. 63-2, NWP00011. The preamble has a section titled "Grandfather Provision for Expiring NWPs," which references 33 C.F.R. Pt. 330.6(b) and 2012 NWP 21(a). *Id.* Defendants contend that the title refers only to 33 C.F.R. Pt. 330.6(b), which is mentioned first. Plaintiffs disagree and attribute much significance to the "grandfather provision" appellation. The court finds the preamble

establish different requirements.  Those paragraphs appear in full below because the different requirements are central to the case.

    (a)    <u>Previously Authorized Surface Coal Mining Activities</u>. Surface coal mining activities that were previously authorized by the NWP 21 issued on March 12, 2007 (see 72 FR 11092), are authorized by this NWP, provided the following criteria are met:

    (1)    The activities are already authorized, or are currently being processed by states with approved programs under Title V of the Surface Mining Control and Reclamation Act of 1977 or as part of an integrated permit processing procedure by the Department of Interior, Office of Surface Mining Reclamation and Enforcement;

    **(2)**    The permittee must submit a letter to the district engineer requesting re-verification of the NWP 21 authorization. The letter must describe any changes from the previous NWP 21 verification. The letter must be submitted to the district engineer by February 1, 2013;

    **(3)**    The loss of waters of the United States is not greater than the loss of waters of the United States previously verified by the district engineer under the NWP 21 issued on March 12, 2007 (i.e., there are no proposed expansions of surface coal mining activities in waters of the United States);

    **(4)**    The district engineer provides written verification that those activities will result in minimal individual and cumulative adverse effects and are authorized by NWP 21, including currently applicable regional conditions and any activity-specific conditions added to the NWP authorization by the district engineer, such as compensatory mitigation requirements; and

    (5)    If the permittee does not receive a written verification from the district engineer prior to March 18, 2013, the permittee must cease all activities until such verification is received ...

    (b)    <u>Other Surface Coal Mining Activities</u>. Surface coal mining activities that were not previously authorized by the NWP 21 issued on March 12, 2007, are authorized by this NWP, provided the following criteria are met:

    (1)    The activities are already authorized, or are

---

ambiguous on this point and deems both the preamble and the appellation irrelevant to determining the legality of 2012 NWP 21(a).  Therefore, the court does not use the contested appellation.

currently being processed by states with approved programs under Title V of the Surface Mining Control and Reclamation Act of 1977 or as part of an integrated permit processing procedure by the Department of Interior, Office of Surface Mining Reclamation and Enforcement;

**(2)**  The discharge must not cause the loss of greater than 1/2-acre of non-tidal waters of the United States, including the loss of no more than 300 linear feet of stream bed, unless for intermittent and ephemeral stream beds the district engineer waives the 300 linear foot limit by making a written determination concluding that the discharge will result in minimal individual and cumulative adverse effects. This NWP does not authorize discharges into tidal waters or non-tidal wetlands adjacent to tidal waters; and

**(3)**  The discharge is not associated with the construction of valley fills. A "valley fill" is a fill structure that is typically constructed within valleys associated with steep, mountainous terrain, associated with surface coal mining activities.

Doc. 63-5, NWP002701-02(emphases added).

In addition to the text of 2012 NWP 21, the Corps' Decision Document contains other information critical to the parties' contentions.  It discusses the Corps' rationale for implementing paragraphs (a) and (b); addresses questions and objections received during the public notice and comment period; and includes the CWA cumulative effects analysis, the NEPA public interest analysis, and the NEPA cumulative effects analysis. *See generally* Doc. 63-5, NWP002701-64.  Several of these topics will be described in more detail as they arise in the below sections.

The district engineer has granted 41 reauthorizations in the Black Warrior River watershed pursuant to 2012 NWP 21(a). Doc. 1, ¶ 54.  The 41 reauthorizations were granted in May 2012 (1), July

2012 (1), December 2012 (18), January 2013 (9), February 2013 (10), March 2013 (1), and April 2013 (1). Doc. 9-1. Plaintiffs filed the present case on November 25, 2013.

DISCUSSION

This action is before the court for consideration of three motions after extensive briefing and submission of evidence. Although the court found that plaintiffs have standing in its earlier order denying a preliminary injunction, it admitted that the challenge was a serious one. The court revisits this issue and begins by considering intervenors' motion to dismiss for lack of subject matter jurisdiction. Pursuant to the below discussion, the court finds that plaintiffs have standing and will deny intervenors' motion to dismiss.

The court then proceeds to the motions for summary judgment, first considering intervenors' motion based on (A) laches; then plaintiffs' and defendants' cross motions based on (B) the five-year term limit of CWA general permits; (C) the cumulative effects analysis under the CWA; and (D) the Finding of No Significant Impact under the NEPA. Intervenors filed an *amicus* brief and reply brief in support of defendants' motion for summary judgment, which the court deems to be a joinder in defendants' motion for summary judgment. The court finds that laches bars plaintiffs' claims and will grant summary judgment on that basis. Even if laches does not bar plaintiffs' claims, the court finds, in the alternative, that

9

defendants and intervenors are entitled to summary judgment on all counts.  These findings are set forth in detail below.

## I.   Motion to Dismiss

Intervenors move to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) based on plaintiffs' asserted lack of standing.  Intervenors make a "factual attack" on plaintiffs' standing and rely on evidence extrinsic to plaintiffs' pleadings, specifically, the declarations and testimony of plaintiffs' members. *See Makro Capital of Am., Inc. v. UBS AG*, 543 F.3d 1254, 1258 (11th Cir. 2008) (quoting *Morrison v. Amway Corp.*, 323 F.3d 920, 925 n.5 (11th Cir. 2003)).  In responding to a factual attack on standing, plaintiffs have the burden to prove by a preponderance of evidence that the court has subject matter jurisdiction. *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981) (binding).[4]  The court "'is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case' without presuming the truthfulness of the plaintiff's allegations." *Makro Capital*, 543 F.3d at 1258 (quoting *Morrison*, 323 F.3d at 925).

The question of plaintiffs' standing, as this court has already conceded, is a very close one.  It has been thoroughly

---

[4] All cases decided by the Fifth Circuit on or before September 30, 1981, are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).  *Paterson v. Weinberger* was decided on May 8, 1981. 644 F.2d at 523.

briefed by plaintiffs and intervenors.  Defendants have not briefed the question of standing but do assert as an affirmative defense in their answer that plaintiffs lack standing. Doc. 60 at 60.  The court finds that plaintiffs have shown standing and will deny intervenors' motion to dismiss.

Organizations, like plaintiffs, have standing to sue on behalf of their members when the members would have standing to bring suit individually, the members' interests relate to the organization's purpose, and neither the claim nor the relief requested requires individual participation by members. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). Intervenors only dispute the first prong, that plaintiffs' members have standing to bring suit individually.

To establish standing for claims under the APA, an individual plaintiff must satisfy both the Article III requirements and the APA's overlapping prudential principles. *Bennett v. Spear*, 520 U.S. 154, 162 (1997).  Article III standing requires a plaintiff to show that he has suffered an injury in fact that is fairly traceable to the conduct complained of and that is likely to be redressable by a favorable decision. *Vermont Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000).  APA prudential principles require a plaintiff to show that the complaint relates to agency action and that the plaintiff has suffered either a "legal wrong" or an injury within the "zone of interests" sought to be protected by the statute that forms the basis of the complaint.

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990) (citing *Clarke v. Sec. Indus. Assn.*, 479 U.S. 388, 396-97 (1987)).

Plaintiffs base their complaint on the Corps' purported failure to abide by procedural requirements in issuing 2012 NWP 21, which they claim has injured their members by impairing downstream water quality and thereby decreasing their aesthetic enjoyment and reducing their opportunities to observe wildlife.   Intervenors counter by arguing (A) that CWA § 404 does not regulate water quality, and that plaintiffs' injuries more properly relate to CWA § 402; and (B) that plaintiffs' members cannot show that their injuries resulted from 2012 NWP 21, as opposed to previous mining or unrelated activities.   The court organizes the discussion of plaintiffs' standing according to these two issues because intervenors use these issues to argue against injury in fact, traceability, redressability, and the APA prudential principles.

## A.   CWA §§ 402 and 404

Intervenors' first argument rests on the interplay between CWA §§ 402 and 404.   They assert that § 404 regulates dredging and filling activities for the **sole** purpose of minimizing the loss of jurisdictional waters.   As support, intervenors point to the § 404(b)(1) Guidelines for assessing the effects of a general permit, which intervenors claim focus on minimizing discharges and mitigating the loss of waters.   In contrast, § 402 regulates the discharge of pollutants into jurisdictional waters. 33 U.S.C. §

1311.   Intervenors claim that § 402 **exclusively** regulates downstream water quality, and any failure by the Corps pursuant to CWA § 404 in issuing 2012 NWP 21 is unrelated to the water quality injuries claimed by plaintiffs.   Thus, pursuant to this asserted distinction between §§ 402 and 404, plaintiffs cannot show causation, redressability, or that their injuries fall within the zone of interests of § 404.

The CWA regulations do not depict as clear a distinction between §§ 402 and 404 as intervenors describe.   The § 404(b)(1) Guidelines require the Corps to evaluate the cumulative effects of a general permit based on certain criteria.   Several criteria directly involve the loss of waters, but several do not. *See* 40 C.F.R. § 230.   Such criteria include "salinity gradients," but also "threatened and endangered species," "other wildlife," "water-related recreation," "aesthetics," and "recreational and commercial fisheries." 40 C.F.R. §§ 230.25-53.   Expanding on one such criterion as an example, the effects considered for "other wildlife" include "the loss or change of breeding and nesting areas, escape cover, travel corridors, and preferred food sources for resident and transient wildlife species associated with the aquatic ecosystem," which include "mammals, birds, reptiles, and amphibians." 40 C.F.R. § 230.32.   This example criterion shows that the Corps analyzes cumulative effects of § 404 permits beyond the loss of waters alone and beyond the immediate point of discharge. The wide-ranging § 404(b)(1) Guidelines do not fit intervenors'

13

assertion that § 404 concerns **solely** the loss of waters and not the downstream water quality or any other secondary effects.

The limited persuasive cases on the distinction between §§ 402 and 404 do not clearly support as sharp a differentiation as intervenors advocate.  The main case cited by intervenors merely says in dicta that §§ 402 and 404 function as "two discrete permitting systems." *See Friends of Crystal River v. EPA*, 35 F.3d 1073, 1075 (6th Cir. 1994).  Such a statement might, but does not clearly or necessarily, imply that § 402 exclusively regulates downstream water quality. *See id.*  One case that touches on the issue more directly is *Kentucky Riverkeeper v. Midkiff*, 800 F. Supp.2d 846, 862 (E.D. Ky. 2011), *rev'd on other grounds sub nom. Kentucky Riverkeeper v. Rowlette*, 714 F.3d 402 (6th Cir. 2013).  In *Midkiff*, mining company intervenors claimed that environmental organization plaintiffs did not have standing because they brought claims under § 404 instead of § 402.  The *Midkiff* court was not persuaded that "only § 402 permits are designed to regulate water quality," and found that "Intervenors' attempt to limit Plaintiffs' members' interests to the point of discharge fails to recognize how the discharge of dredged or fill materials impacts downstream waterways." *Id.*  The *Midkiff* court determined that plaintiffs had standing because their members alleged the kinds of injuries that the Corps had identified as adverse environmental effects in its Decision Documents. *Id.*  Although more briefly, another case discussed a similar argument that plaintiffs injuries "caused by

downstream water quality impacts" would "fall under the zone of
interests protected by a § 402 [pollution discharge] permit and not
a § 404 fill permit." *Kentuckians for Commonwealth v. U.S. Army
Corps of Engineers*, 963 F. Supp. 2d 670, 681 (W.D. Ky. 2013), *aff'd*
746 F.3d 698 (6th Cir. 2014).  The *Kentuckians* court said that it
"does not view the 'zone of interests' inquiry so narrowly" and
noted that the plaintiffs allege injuries to their health,
aesthetic, and recreational interests as well as to the water
quality. *Id.* (quotation omitted).  Collectively, these non-binding
cases suggest that injuries from water pollution **alone** might fall
exclusively under § 402, but that injuries involving broader
interests of the kinds identified in the Decision Document as being
adversely affected can confer standing to bring suit under § 404.

The court reiterates that the question of plaintiffs' standing
is a close one, and intervenors ultimately may be correct that the
distinction between §§ 402 and 404 precludes plaintiffs' standing.
But, until a binding court agrees with intervenors, this court does
not find that the CWA regulations and the limited non-binding cases
make the distinction sharp enough to dismiss plaintiffs' claims on
this basis.

**B.   Other Sources of Plaintiffs' Injuries**

Intervenors also contend that plaintiffs cannot prove that
mining activities authorized under 2012 NWP 21, as opposed to
previous mining or other activities, caused their injuries.  This

contention relates foremost to traceability and redressability. "To show traceability in a Clean Water Act case, '[r]ather than pinpointing the origins of the particular molecules, a plaintiff must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged in the specific geographic area of concern.'" *New Manchester Resort & Golf, LLC v. Douglasville Dev., LLC*, 734 F. Supp. 2d 1326, 1333 (N.D. Ga. 2010) (quoting *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 161 (4th Cir. 2000) (en banc) (citing *Public Interest Research Group of N.J., Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 72 (3d Cir. 1990)). The Corps has recognized in the Decision Document that activities authorized by 2012 NWP 21 can cause altered visual character of the water, decreased quantity and quality of fish and wildlife habitat, changed character of the land, reduced recreational benefits, and increased sediments and pollutants in the water. Doc. 63-5, NWP002742-47. Plaintiffs' members allege these types of injuries in the areas downstream from the surface mining activities authorized by 2012 NWP 21. *See* Background (I) Facts Related to Standing. Therefore, plaintiffs' injuries are fairly traceable to 2012 NWP 21.

Plaintiffs have shown redressability because vacatur of 2012 NWP 21, or 2012 NWP 21(a) more narrowly, would result in some combination of the activities reauthorized under 2012 NWP 21(a) shutting down, the Corps issuing a new general permit, or the

activities reauthorized under 2012 NWP 21(a) applying for individual permits.  In each of these circumstances, plaintiffs would gain an immediate cessation of discharges and a considerable amount of time before further discharges.  Although a new general permit or individual permits would still allow discharges, they could involve stricter regulations or site-specific limitations on the activities.  The prospects of a cessation of discharges, stricter regulations, and/or site-specific limitations suffice to show that plaintiffs' injuries would likely be redressed by vacatur of 2012 NWP 21 or 2012 NWP 21(a).

## II.  Motions for Summary Judgment

To grant summary judgment, a court must determine that there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56.  A genuine dispute of material fact exists if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  For the purposes of summary judgment, the court views all admissible evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).  The court's function does not extend to "weigh[ing] the evidence and determin[ing] the truth of the matter" but is limited to "determin[ing] whether there is a genuine issue for

trial." *Liberty Lobby*, 477 U.S. at 249.

The parties do not dispute the material facts and acknowledge that this case rests primarily on the administrative record. Intervenors seek summary judgment based on (A) laches. Plaintiffs, defendants, and intervenors seek summary judgment based on (B) the CWA five-year term limit; (C) the CWA cumulative effects analysis; and (D) the Finding of No Significant Impact under the NEPA.

## A.   Laches

In addition to their joinder in defendants' motion for summary judgment, intervenors contend that laches bars plaintiffs' claims. Defendants invoke laches in their answer but do not join in intervenors' motion for summary judgment or argue for summary judgment on this ground.  Intervenors' argument on laches is well-taken and should conclude the case, although the court will address plaintiffs', defendants', and intervenors' arguments based on the CWA and the NWPA in the alternative.

Laches is an equitable doctrine that bars a plaintiff's claims if granting his requested remedy would be inequitable due to his delay in filing suit. *Envtl. Def. Fund, Inc. v. Alexander*, 614 F.2d 474, 478 (5th Cir. 1980).  Laches applies when the moving party shows "(1) a delay in asserting a right or claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against whom the claim is asserted." *Id.*  Some circuits disfavor applying laches in environmental cases and use a stricter

standard. *See, e.g.*, *Park Cnty. Res. Council, Inc. v. United States Dep't of Agric.*, 817 F.2d 609, 617 (10th Cir. 1987), *overruled on other grounds, Vill. of Los Ranchos De Albuquerque v. Marsh*, 956 F.2d 970, 971 (10th Cir. 1992). The Eleventh Circuit has never adopted such a strict standard. *See Manasota-88, Inc. v. Thomas*, 799 F.2d 687, 693 n.10 (11th Cir. 1986); *Ecology Ctr. of La., Inc. v. Coleman*, 515 F.2d 860, 867-68 (5th Cir. 1975) (laches applied normally to NEPA claims).

Before addressing the elements of laches in application to this particular case, plaintiffs argue that laches should not apply because equity cannot be used to defeat the will of Congress in limiting CWA general permits to five-year terms. This argument rests on the proposition that the Corps extended authorizations under 2007 NWP 21 for an additional five years when it granted reauthorizations under 2012 NWP 21(a). As discussed in section (B) below, plaintiffs do not succeed in showing the underlying proposition and, thus, cannot rely on this argument for the purposes of laches.

Proceeding to the element of delay, plaintiffs argue that the grants of reauthorizations provide the appropriate benchmark for when plaintiffs had standing to challenge 2012 NWP 21 (a) and thus when their claims became ripe. In support, plaintiffs cite cases under the National Forest Management Act. *See* Doc. 71 at 33. More relevant than the cited persuasive authority, the Eleventh Circuit case on point says that the proper time to challenge higher-level

agency rules is at the site-specific stage **because** the site-specific stage entails "discretionary actions" with "separate and independent decisionmaking," and only afterwards is the injury sufficiently imminent and the controversy ripe. *Wilderness Soc. v. Alcock*, 83 F.3d 386, 390 (11th Cir. 1996) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 892 n.3 (1990)) (quotation marks omitted). Plaintiffs analogize[5] to argue that it was reasonable for them to wait until after the district engineer granted 2012 NWP 21(a) reauthorizations before bringing suit. This court agrees given that the district engineer conducts a separate cumulative effects analysis and has discretion to require operations requesting reauthorizations to apply for individual permits or to fulfill activity-specific conditions.[6] However, the court notes that plaintiffs' argument relies on a premise logically inconsistent with the rest of their contentions. Plaintiffs clearly do **not** assert for the purposes of their CWA and NEPA claims that the district engineer engaged in independent decisionmaking when reviewing reauthorizations, in which case plaintiffs' injuries

---

[5] The rule structures for the Corps' CWA permits and the United States Forest Service's National Forest Management Act permits are not precisely the same. Rather than parsing this analogy in detail, as plaintiffs do not, this court takes *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 966 (9th Cir. 2003) and *Wilderness Soc. v. Alcock*, 83 F.3d 386, 390 (11th Cir. 1996) as generally speaking to challenging higher-level agency rules at subsequent, site-specific stages.

[6] Plaintiffs may also have had difficulty showing standing if they had filed suit before the grant of 2012 NWP 21(a) reauthorizations because their standing depended on the as-yet unknown actions of third parties. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992). Until someone sought a 2012 NWP 21(a) reauthorization and the district engineer granted it, the concrete injuries to plaintiffs' members might have proven too speculative. *See id.*

should have been sufficiently imminent when 2012 NWP 21 became effective on March 19, 2012.  Passing over that contradiction, plaintiffs could have brought suit as soon as a **single** reauthorization was granted in the Black Warrior River watershed ——as early as May 2012, but certainly by January or February 2013 when 29 and 39 reauthorizations had been granted, respectively.

Plaintiffs do not address the delay between January or February 2013, when a substantial number of 2012 NWP 21(a) reauthorizations had been granted, and November 25, 2013, when plaintiffs actually brought suit.  Without any reason provided, the court finds this delay of 9-10 months to be unexcused and, in fact, inexcusable. *See Envtl. Def. Fund, Inc. v. Alexander*, 614 F.2d 474, 478 (5th Cir. 1980).

Predicated on an unexcused delay in asserting a claim, laches also requires "undue prejudice to the party against whom the claim is asserted." *Id.*  This element involves "balanc[ing] the equities, considering both the expenditures which have been made by the defendants and the environmental benefits which might result ..." *Save Our Wetlands, Inc. (SOWL) v. U.S. Army Corps of Engineers*, 549 F.2d 1021, 1028 (5th Cir. 1977).  A binding Fifth Circuit case found no undue prejudice when contract bidding to construct an interstate highway had been completed but very little construction had begun; no evidence was submitted about the importance of the highway; and construction had not yet significantly affected the highly productive and diverse ecosystem. *Ecology Ctr. of La., Inc.*

*v. Coleman*, 515 F.2d 860, 869 (5th Cir. 1975).  The Fifth Circuit contrasted this situation with a district court case that properly found undue prejudice when a highway construction was 25-30% completed; defendant had expended vast sums of money and made significant progress toward public transportation goals; and construction had already damaged the park's aesthetics. *Id.* at 868-69 (citation omitted).

Applying this framework for undue prejudice to the present case, intervenors' expenditures and reliance since the dates of their reauthorizations must be weighed against any environmental benefits of invalidating 2012 NWP 21(a).  Intervenors present evidence that they relied on their granted reauthorizations to purchase mining equipment, hire mine workers, enter into various contracts, make sales commitments to customers, Docs. 14-1 to 14-5; and that at least some intervenors continued or initiated mine development and acquired land, Doc. 14-4, ¶ 10.[7]  Intervenors do not specify all of the consequences that 2012 NWP 21(a) being invalidated would have on these commitments.  Given that the mining operations would shut down pending a new general permit or an individual permit, both lengthy processes, the resulting lost income and product would likely cause intervenors to at least

---

[7] Intervenors' reply brief mistakenly focuses on the harm, in general, that would result if 2012 NWP 21(a) were vacated. *See* Doc. 73 at 15-17.  For the purposes of laches, it is irrelevant that a certain mine would have to lay off employees if 2012 NWP 21(a) were vacated **unless** that harm only occurs because of plaintiffs' delay in bringing suit.  The relevant prejudice derives from intervenors' reliance between the time of their reauthorizations and the date of plaintiffs' suit, not from the mere fact of vacatur.

breach some contracts and financing agreements.  Plaintiffs point out that this evidence does not include dollar amounts or specific dates, and does not provide details for all 38 mines held by intervenors and their members.  Lack of specificity goes to weight in the court's equitable balancing, but plaintiffs do not dispute the veracity of the declarations or present contrary evidence, so the facts of intervenors' expenditures and reliance remain uncontested.

As for the environmental benefits, plaintiffs claim that mining operations could fill over 27 miles of streams pursuant to the 41 reauthorizations, more than ten times the 300-foot limit in 2012 NWP 21(b).  Plaintiffs argue that invalidating 2012 NWP 21(a) would have environmental benefits by forcing mining operations to comply with the 300-foot limit, which they assert the Corps has found necessary to avoid more than minimal environmental effects.  Doc. 71 at 30-31.  The problem with this argument is two-fold.  First, the mining operations would not proceed under the 300-foot limit, but would need either a new general permit or an individual permit, so that plaintiffs' calculation of the benefits proceeds from a faulty premise.  This court also cannot predict which approach the Corps would take if 2012 NWP 21(a) were invalidated.  Second, the Corps did not find the 300-foot limit the only way to avoid more than minimal environmental effects.  Indeed, the Corps could not have issued 2012 NWP 21 unless it found that operations under 2012 NWP 21(a) would not have more than minimal effects——a

finding that plaintiffs dispute, as discussed below. *See* CWA § 1344(e). This dispute and the two-fold problem with plaintiffs' argument make the environmental benefits of invalidating 2012 NWP 21(a) uncertain and speculative.

Weighing intervenors' uncontested, although incomplete, evidence of expenditures and reliance on the reauthorizations and plaintiffs' disputed evidence of environmental benefits, the court finds that unfair prejudice has been shown. Intervenors took actions in reliance on the reauthorizations in the 9-10 months that plaintiffs delayed before bringing suit. The court **knows** that intervenors would be badly hurt by a vacatur of 2012 NWP 21(a), but cannot say whether vacatur would benefit plaintiffs. Thus, intervenors have shown unexcused delay and unfair prejudice, and the court finds that laches bars plaintiffs' claims.

## B.   CWA Five-Year Term Limit

Plaintiffs contend that the Corps implicitly extended authorizations under 2007 NWP 21 for five years when it granted reauthorizations under 2012 NWP 21(a), and that this extension violates the five-year term limit of general permits under the CWA. Plaintiffs further contend that, because this extended term violates the CWA, the Corps' conduct in issuing 2012 NWP 21 was arbitrary and capricious under the APA. The court finds that 2007 NWP 21 and 2012 NWP 21 satisfy the CWA procedural requirement that general permits have five year terms, and the Corps' issuance of

2012 NWP 21 was not arbitrary and capricious on this ground.

The APA permits the setting aside of an agency action only where the action is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  The arbitrary and capricious standard is highly deferential, and the court cannot substitute its judgment for that of the agency as long as the agency's conclusions are rational and reasonably explained. *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008).  An agency action may be found arbitrary and capricious if the agency relied on inappropriate factors, failed to consider important aspects, or provided explanations either contrary to the evidence or wholly implausible. *See Miccosukee Tribe of Indians of Florida v. United States*, 566 F.3d 1257, 1264 (11th Cir. 2009).  Courts must give special deference when an agency "is making predictions, within its area of special expertise, at the frontiers of science ... as opposed to simple findings of fact" *Id.* (quoting *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 103 (1983)).

Section 404(e)(2) of the CWA provides that "[n]o general permit issued under this subsection shall be for a period of more than five years after the date of its issuance." 33 U.S.C. § 1344(e)(2).  Indisputably, 2007 NWP 21 had a five-year term and has expired.  Likewise, 2012 NWP 21 has a five-year term.  Plaintiffs do not argue that the Corps expressly extended authorizations under 2007 NWP 21 but argue that, by giving them differential treatment

under 2012 NWP 21(a), the Corps implicitly extended the prior authorizations.

Section 404(e)(2) is simply a procedural provision, a time limit on the effectiveness of general permits. It does not impose constraints on the content of general permits or require that general permits and their treatment of permittees change for each permit reissuance. Whether activities authorized by the general permit continue unabated for ten years, § 404(e)(2) is satisfied provided that the term of effectiveness of the general permit remains five years. As there is no real dispute about the express term, 2012 NWP 21(a) does not violate the CWA on this ground, and defendants' conduct was not arbitrary and capricious in issuing 2012 NWP 21. Thus, defendants and intervenors are entitled to summary judgment on Count One.

## C.   CWA Cumulative Effects Analysis

Plaintiffs argue that 2012 NWP 21(a) violates the CWA requirement that the activities covered by the permit not have more than minimal cumulative environmental effects and, therefore, the Corps' issuance of 2012 NWP 21 was arbitrary and capricious under the APA. More specifically, plaintiffs assert that (1) the Corps did not conduct a CWA cumulative effects analysis for 2012 NWP 21(a); (2) the Corps improperly relied on its CWA cumulative effects analysis conducted for 2007 NWP 21; and (3) the Corps improperly considered compensatory mitigation, which lacks a

factual basis.  The arbitrary and capricious standard, described in section B above, applies to review of the Corps' CWA cumulative effects analysis.  The court finds (1) that the Corps completed a CWA nationwide cumulative effects analysis for 2012 NWP 21 that incorporates both paragraphs (a) and (b); (2) that the Corps did not rely on its cumulative effects analysis from 2007 NWP 21; and (3) that the Corps did not improperly consider compensatory mitigation, and compensatory mitigation has a sufficient factual basis.  These findings entitle defendants and intervenors to summary judgment on Count Two.

### 1.  Cumulative Effects Analysis for 2012 NWP 21(a)

The Corps may only issue a general permit if it determines that the covered activities will have minimal adverse environmental effects separately and cumulatively. CWA § 1344(e).  To satisfy this requirement, the Corps must first conduct a national-level analysis, including an estimate of how many operations will likely be regulated under the NWP until its expiration. 40 C.F.R. § 230.7(b)(3).  If and only if the Corps determines that the covered activities will have no more than minimal adverse effects nationwide, does the Corps issue the general permit.  Next, the district engineer conducts a local-level analysis and adjusts the nationwide NWP if the covered activities are likely to have more than minimal adverse effects within a particular area.  Plaintiffs contend that the Corps did not make a national minimal cumulative

adverse effects determination for 2012 NWP 21(a).

The Corps made a clear determination that the activities covered by 2012 NWP 21, under both paragraphs (a) and (b), will result in minimal adverse effects pursuant to a national CWA cumulative effects analysis. In accordance with CWA requirements, the Corps estimated the number of operations that would be regulated nationally by the NWP over its five-year term. Doc. 63-5, NWP002751-52. The Corps then considered compensatory mitigation, a topic addressed in more detail later, and concluded:

> [T]he Corps has determinated that the discharges authorized by this NWP comply with 404(b)(1) [cumulative effects] Guidelines, with the inclusion of appropriate and practicable conditions, including mitigation, necessary to minimize adverse effects on affected aquatic ecosystems. The activities authorized by this NWP will result in minimal individual and cumulative adverse effects on the aquatic environment.

*Id.* at NWP002760.[8] The CWA requires only one cumulative effects analysis, not two separate analyses for paragraphs (a) and (b). *See* CWA § 404(e). The Corps has no additional burden of proof because 2012 NWP 21 diverges from how 2007 NWP 21 classified surface mining operations. *See F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 519 (2009) (citations omitted). This court does not believe that a regulatory agency like the Corps must study, anticipate, and provide for every possible adverse eventuality before approving a

---

[8] The operation-specific reauthorization criteria are separate from the national cumulative effects analysis. The Decision Document shows that the Corps did not "rel[y] <u>solely</u> on the District Engineer's decision memoranda [on 2012 NWP 21(a) reauthorization criteria] to satisfy" the national cumulative effects analysis, as plaintiffs claim. Doc. 68 at 5.

regulated activity.

Plaintiffs try to recast the Corps' minimal cumulative effects determination as only pertaining to paragraph (b), but the plain meaning of "activities authorized by this NWP" include those authorized under paragraphs (a) and (b). *See* Doc. 63-5, NWP002760. The passages quoted by plaintiffs support this interpretation. Plaintiffs quote: "The substantial changes in the terms and conditions of the reissued NWP 21 will ensure that the activities authorized by this NWP result in minimal individual and cumulative adverse effects on the aquatic environment." *Id.* at NWP002708. The **preceding** sentence, however, mentions changes implemented in paragraph (a) as well as in paragraph (b):

> The NWP reissued today has been substantially modified from the 2007 version of NWP 21, with paragraph (a) authorizing Corps district engineers to re-authorize activities that were previously verified under the 2007 NWP 21 authorization where that would be appropriate, and paragraph (b) imposing the acreage and linear foot limits stated above, as well as the condition prohibiting its use for the construction of valley fills....

*Id.* Later references to "changes to NWP 21" and its "new terms and conditions" logically mean **all** changes and **all** new terms and conditions, or the Corps would specify which change. *See id.* at NWP002721–23. Thus, statements that "the new terms and conditions of this NWP, including [but not exclusive to] the 1/2 acre and 300 linear foot limits, are necessary to ensure" compliance with the CWA cumulative effects analysis presumably incorporate both paragraphs (a) and (b) and are consistent with the Corps' CWA

minimal cumulative effects determination. *See id.* at NWP002721.

## 2. 2007 NWP 21 Cumulative Effects Analysis

Plaintiffs contend that the Corps improperly relied on its CWA cumulative effects analysis from 2007 when issuing 2012 NWP 21. The sentence that plaintiffs cite in support is ambiguous, but the debatable implications from this one sentence do not outweigh the Corps' clear CWA minimal cumulative effects determination that relies on a 2008 mitigation rule not present in the 2007 cumulative effects analysis.

The placement of the disputed sentence makes its implications ambiguous such that neither the plaintiffs' interpretation nor the Corps' interpretation is clearly correct.  Because the Corps argues that plaintiffs take the sentence out of context, the full paragraph appears below:

> The decision document for this NWP includes evaluations of cumulative effects under [the NEPA and the CWA], and concludes that the reissuance of this NWP, including the imposition of the 1/2-acre limit, 300 linear foot limit, and prohibition against authorizing valley fills on activities that were not previously authorized under the 2007 NWP 21, as well as the pre-construction notification requirements and other procedural safeguards, will authorize only those activities with minimal individual and cumulative adverse effects on the aquatic environment. **Activities authorized under the 2007 NWP 21 were already determined by district engineers to result in minimal individual and cumulative adverse effects on the aquatic environment.** The other procedural safeguards include the authority for division engineers to modify, suspend, or revoke NWP 21 authorizations on a regional basis, and the authority for district engineers to modify NWP 21 authorizations by adding conditions, such as compensatory mitigation requirements, to ensure minimal individual and cumulative adverse effects on the aquatic

30

environment. District engineers may also assert
discretionary authority to require individual permits in
cases where the adverse effects will be more than
minimal.

Doc. 63-5, NWP002711 (emphasis added). Plaintiffs argue that
"[t]here is no need to make this statement unless the Corps
intended to rely on its earlier 2007 analysis." Doc. 68 at 16. The
Corps counters that it included the sentence as an aside, to
"mak[e] the point that the new limits and additional review under
2012 NWP 21 would be more robust than the 2007 permit." Doc. 63-1
at 32. Furthermore, the Corps emphasizes that the paragraph does
not state that the Corps **relied on** the 2007 analysis. The
placement of the disputed sentence is ambiguous; it could
implicitly replace some portion of the 2012 analysis or it could
function as a superfluous aside.

The centrality of the 2008 mitigation rule to the 2012
analysis bolsters the Corps' explanation that it did not rely on
the 2007 analysis. The 2012 analysis has prevalent references to
the Corps' 2008 rule designed to improve compensatory mitigation
practices, 33 C.F.R. § 332. *See* Doc. 63-5, NWP002752-54.
Unsurprisingly, the 2007 analysis did not use the 2008 rule's
changed compensatory mitigation requirements. The importance of
compensatory mitigation to the Corps' minimal cumulative effects
determination and the centrality of the 2008 mitigation rule's
requirements adds weight to the Corps' explanation that it did not
rely on the 2007 analysis.

31

The Corps has given a rational explanation for why it included the disputed sentence without denoting reliance on the 2007 analysis, an explanation bolstered by the centrality of the Corps' 2008 mitigation rule to the 2012 analysis.  The APA requires that an agency's explanation be rational and reasonably explained, and not contrary to the evidence or wholly implausible. *See Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008); *Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257, 1264 (11th Cir. 2009).  The Corps' explanation satisfies this standard.[9]

### 3.    Compensatory Mitigation

Plaintiffs claim that the Corps' CWA cumulative effects analysis is arbitrary and capricious because the Corps did not properly consider compensatory mitigation and because compensatory mitigation does not have a factual basis.  This court finds the contrary, that the Corps did not improperly consider compensatory mitigation based on the CWA and Eleventh Circuit case law, and the Corps' compensatory mitigation has a sufficient factual basis.

The parties' disagreement centers on whether the Corps can

---

[9] The Sixth Circuit concluded that the Corps extended its reliance on the 2007 NWP 21 analysis to determine that 2012 NWP 21(a) would have minimal cumulative effects. *See Ky. Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402, 406-07 (6th Cir. 2013).  The Sixth Circuit looked to the public notice of 2012 NWP 21 in the federal register, but it did not examine the Decision Document or the full administrative record. *See id.*; Doc. 72 at 10 (administrative record for 2012 NWP 21 filed for the first time in the present case).  This court considers the Decision Document critical to determining if the Corps relied on its 2007 analysis in conducting the 2012 cumulative effects analysis because the Decision Document **contains** the 2012 cumulative effects analysis.  With the full record before it, for the reasons explained in section (C)(2) above, this court respectfully disagrees with the Sixth Circuit's conclusion.

consider compensatory mitigation to be completed *after* issuance of the general permit as part of its cumulative effects analysis conducted *before* issuance.  Plaintiffs claim that the Corps cannot consider post-issuance compensatory mitigation, and they argue against following the case that would allow the Corps to do so, *Ohio Valley Envtl. Coal. v. Bulen*, 429 F.3d 493 (4th Cir. 2005). *Bulen* found that the CWA is silent on this issue and would allow the Corps to partially rely on post-issuance compensatory mitigation if it conducts a "good-faith, comprehensive, pre-issuance review of the anticipated environmental effects of the activities authorized." *Id.* at 502.  Plaintiffs' arguments notwithstanding, the Eleventh Circuit has chosen to follow *Bulen*. *See Sierra Club v. U.S. Army Corps of Engineers*, 508 F.3d 1332, 1337 (11th Cir. 2007).  In *Sierra Club*, the Eleventh Circuit affirmed a district court that explicitly chose to follow *Bulen*. *Sierra Club v. U.S. Army Corps of Engineers*, 464 F. Supp. 2d 1171, 1211 (M.D. Fla. 2006), *aff'd* 508 F.3d 1332 (11th Cir. 2007).  The district court there found that "the Corps did not violate the CWA in utilizing post-issuance (post-permit) conditions, including mitigation, to make its pre-issuance (pre-permit) minimal adverse environmental effects determination." *Id.* at 1210-11 (quotation marks omitted).  The Eleventh Circuit "agree[d] with the district court's reasoning" that the permit complied with the CWA **including** "mitigating any environmental effects so they are minimal," and concluded that "this Permit is within Congress' grant of authority

to the Corps to issue general permits." *Sierra Club*, 508 F.3d at 1337.   So long as the Corps conducted the "good-faith, comprehensive, pre-issuance review of the anticipated environmental effects of the activities authorized" described in *Bulen*, the Corps' consideration of post-issuance compensatory mitigation does not render its CWA cumulative effects analysis arbitrary and capricious.

Plaintiffs also assert that the Corps' consideration of compensatory mitigation is arbitrary and capricious because the Corps' claim that compensatory mitigation ensures minimal cumulative effects does not have a factual basis.   CWA regulations require that the Corps give "documented information supporting each factual determination," including the determination of minimal cumulative effects. 40 C.F.R. §§ 230.7(a)-(b), 230.11(g).   These regulations link back to the APA arbitrary and capricious standard because the Corps must provide a "satisfactory explanation for its action including a rational connection between the facts found and the choice made." *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation and quotation marks omitted).   Thus, the Corps "must, at a minimum, provide *some* documented information supporting [its] finding [that compensatory mitigation will ensure minimal cumulative effects.]" *Ky. Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402, 413 (6th Cir. 2013).   "The 'mere listing' of mitigation measures and processes, without any analysis, cannot support a cumulative impacts determination."

*Ohio Valley Envtl. Coal. v. Hurst*, 604 F. Supp. 2d 860, 887 (S.D. W.Va. 2009) (quoting *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 734 (9th Cir. 2001)).

The court finds that the Corps' CWA cumulative effects analysis provides a sufficient factual basis for the Corps' consideration of compensatory mitigation. Several of the scientific sources cited in the Decision Document address the success of compensatory mitigation. The Corps cites one article that finds that "[w]etland restoration is becoming more successful, especially in cases where monitoring and adaptive management are used to correct deficiencies in these efforts." Doc. 63-5, NWP002753 (citing J.B. Zedler & S. Kercher, *Wetland Resources: Status, Trends, Ecosystem Services, and Restorability in* Annual Review Environmental Resources 30:39-74 (2005)). The Corps discusses monitoring and adaptive management as two key aspects of the 2008 mitigation rule soon afterwards. *Id.* at NWP002753-54. Another scientific source identifies stream rehabilitation as typically "the most effective compensatory mitigation mechanism" and describes actions that have had "varying degrees of success in stream rehabilitation activities." *Id.* at NWP002753 (citing P. Roni, K Hanson & T. Beechie, *Global Review of the Physical and Biological Effectiveness of Stream Habitat Rehabilitation Techniques*, N. Am. J. of Fisheries Mgmt., 28:856-90 (2008)). The Corps cites a 2010 article that discusses how "[e]cologically successful stream rehabilitation and enhancement activities depend

on addressing the factors that most strongly affect stream functions, especially water quality, water flow, and riparian quality, and not focusing solely on rehabilitating or enhancing the physical habitat of streams." *Id.* (citing M.A. Palmer, H.L. Menninger & E. Bernhardt, *River Restoration, Habitat Heterogeneity, and Biodiversity: A Failure of Theory or Practice? in* FRESHWATER BIOLOGY 55:205-22 (2010)). Lastly, the Corps cites a 2011 study covering 2004-2009 that found that efforts to reestablish or establish wetlands have been successful in increasing wetland acreage in the United States. *Id.* at NWP002754 (citing T.E. DAHL, U.S. DEPARTMENT OF THE INTERIOR, FISH & WILDLIFE SERVICE, STATUS AND TRENDS OF WETLANDS IN THE CONTERMINOUS UNITED STATES 2004 TO 2009 (2011), *available at* http://www.fws.gov/Wetlands/Documents/Status-and-Trends-of-Wetlands-in-the-Conterminous-United-States-2004-to-2009.pdf). Although the Corps' summary does not give much detail, the actual scientific study does. *See* DAHL, STATUS AND TRENDS, 71-80. This court stops short of requiring the Corps to incorporate entire scientific works into its administrative record or quoting said works at length to demonstrate that its findings have a factual basis. The Corps cites several recent scientific works that analyze the success of compensatory mitigation, and such sources give the Corps "a rational connection between the facts found" and its choice to consider compensatory mitigation in the cumulative effects analysis. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

D.    **Finding of No Significant Impact Under the NEPA**

Plaintiffs argue that the Corps' Finding of No Significant Impact under the NEPA is arbitrary and capricious because the Corps failed to properly analyze the cumulative effects of 2012 NWP 21(a). Plaintiffs' arguments under the NEPA mirror their arguments under the CWA: the Corps found 300-foot and 1/2 acre limits of 2012 NWP 21(b) "necessary" to avoid more than minimal adverse effects; the Corp relied on the 2007 NWP 21 analysis; and the Corps improperly relied on factually unsupported compensatory mitigation. Like its determinations under the CWA, the Corps' NEPA determinations are reviewed under the APA's "high deferential standard." *See Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008). Plaintiffs' NEPA arguments do not succeed for the same reasons that their CWA arguments do not. *See* section II(C); Doc. 63-5, NW002737-42. Defendants and intervenors are entitled to summary judgment on Count Four.

## CONCLUSION

Although plaintiffs' standing presents a close question, the CWA regulations and non-binding cases do not give sufficient reason for this court to find that plaintiffs lack standing to bring claims under CWA § 404. Accordingly, the court will deny intervenors' motion to dismiss for lack of subject matter jurisdiction. But the court will grant intervenors' motion for summary judgment because, after balancing the equities, the court

finds that laches bars plaintiffs' claims.  Even if laches does not apply, defendants and intervenors are entitled to summary judgment on all counts.

DONE this 21st day of May, 2014.

_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE