IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| BLACK WARRIOR RIVERKEEPER, INC., et al., | } } } |
| Plaintiffs, | } } } |
| v. | } Case No. 2:13-CV-02136-WMA } } |
| U.S. ARMY CORPS OF ENGINEERS, et al. | } } } |
| Defendants, | } } } |
| THE ALABAMA COAL ASSOCIATION, et al., | } } } } |
| Intervenor-Defendants. | } |

**<u>MEMORANDUM OPINION</u>**

Before the court are cross-motions for summary judgment[1] as reflected in the Revised Decision Document filed by defendant U.S. Army Corps of Engineers on August 7, 2015 (Doc. 90).

After inviting comment by the parties (Doc. 92) through briefs simultaneously filed August 31, 2015 (Doc. 93; Doc. 94; Doc. 95), this court entered an order on September 4, 2015 acknowledging plaintiffs' motion for summary judgment separately attached to their comment (Doc. 94) and deeming the comments by defendants and intervenor-defendants to be renewed motions for summary judgment

---

[1] Summary judgment must be granted if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(c). When disputed, the facts are presented in the light most favorable to the non-moving party. See *Baldwin County, Ala. v. Purcell Corp.*, 971 F.2d 1558, 1563 (11th Cir. 1992).

1

(Doc. 96). Pursuant to this court's briefing schedule, the parties on September 21, 2015 filed their respective responses to the motions of opposing parties (Doc. 97; Doc. 98; Doc. 99), and plaintiffs filed a reply on September 30, 2015 to defendants' and intervenor-defendants' said responses. (Doc. 100). Having been fully briefed by all parties, the Rule 56 motions are now under submission.

For the reasons stated below, plaintiffs' motion will be denied, and defendants' and intervenor-defendants' motions for summary judgment will be granted.

## BACKGROUND

On May 21, 2014 this court issued a memorandum opinion and order published as *Black Warrior Riverkeeper, Inc. v. Army Corps of Eng'rs*, 23 F. Supp. 3d 1373 (N.D. Ala. 2014). It upheld as neither arbitrary nor capricious under the Administrative Procedure Act ("APA") the Corps' decision to issue a general nationwide permit ("NWP") to defendants allowing discharges from certain mining activities into navigable waters ("NWP 21") pursuant to the Clean Water Act (CWA) and the National Environmental Policy Act ("NEPA"). *Id*. at 1387-93.

Amidst plaintiffs' appeal to the Eleventh Circuit, and on the eve of oral argument, the Corps admitted "that it underestimated the number of acres of waters that may be impacted by NWP 21." *Black Warrior Riverkeeper, Inc. v. Army Corps of Eng'rs*, 781 F.3d

1271, 1288 (11th Cir. 2015).  In light of this admission, the Eleventh Circuit remanded the case to this court with instructions to "remand the matter to the Corps for a thorough reevaluation [within one year] of the Corps' CWA and NEPA determinations in light of all of the relevant data, including the Corps' recalculated figure for the acreage of waters affected by NWP 21." *Id.* at 1291.  The Eleventh Circuit opined that after such a reevaluation "the Corps may well conclude on remand that its factual projections were indeed so erroneous that . . . [it] cannot ensure the cumulative adverse effect of NWP 21 on the environment will be minimal[,] [o]r, as the Corps suggests it may be able readily to cure this defect in its explanation and reaffirm its original decision." *Id*. at 1289 (quotation omitted).

Consistent with the Eleventh Circuit's instructions, this court on June 22, 2015 entered an order remanding the matter to the Corps for a "thorough reevaluation of the Corps' CWA and NEPA determinations in light of all of the relevant data, including the Corps' recalculated figure for the acreage of waters affected by NWP 21." (Doc. 84 at 1).

On August 7, 2015, the Corps filed its Revised Decision Document, which corrected its calculation errors and reaffirmed its original decision to issue NWP 21. (Doc. 90).  Specifically, the Revised Decision Document concluded:

> After considering the revised estimates provided above in accordance with 40 CFR 230.7(b)(3) [per the CWA], **despite the**

> **higher impact and compensatory mitigation amounts expected to occur across the country** during the five year period this NWP is in effect, **the Corps has determined that the individual and cumulative adverse effects on the aquatic environment resulting from the activities authorized by this NWP will be minimal**. Compliance with the terms and conditions of this NWP, including the mitigation general condition (general condition 23), as well as compliance with regional conditions imposed by division engineers and activity-specific conditions added to NWP verifications by district engineers, will ensure that the activities authorized by this NWP will result in no more than minimal individual and cumulative adverse effects on the aquatic environment. In addition to the other mitigation measures required by the terms and conditions of this NWP, compensatory mitigations may be required by district engineers to offset losses of waters of the United States to further ensure that the individual and cumulative adverse effects of activities authorized by NWPs on the aquatic environment are minimal.
> 
> * * *
> 
> Based on the information in this document, including the revised cumulative effects analyses in sections 4.3 and 6.2.2 [per NEPA], the Corps has determined that the issuance of **this NWP will not have a significant impact on the quality of the human environment.**

(Doc. 90-2 at 17; 90-2 at 23) (emphasis added).  While all the parties agree that the Corps has corrected its math error (Doc. 97 at 25; Doc. 98 at 2; Doc. 99 at 4), Riverkeeper continues to argue that the Corps' issuance of NWP 21 is arbitrary and capricious and therefore violative of federal law (Doc. 98; Doc. 100).  Given the substantial overlap in the requirements of NEPA and the CWA, both the Revised Decision Document and the briefing by the parties addressed these two statutes' requirements together.  This court similarly considers arguments under both statutes together.

## DIFFERENTIAL TREATMENT ERROR

In Riverkeeper's prior arguments before this court and in its

4

appeal to the Eleventh Circuit under the Corps' original decision document, Riverkeeper argued that the Corps' decision was arbitrary and capricious because it contained a "differential treatment error." *Black Warrior Riverkeeper,* 23 F. Supp. 3d at 1387; *Black Warrior Riverkeeper*, 781 F.3d at 1288.  The Corps' original decision document for NWP 21 contained subsection NWP 21(a), a provision grandfathering certain operations previously authorized in a prior permit, and NWP 21(b), a provision that authorized certain new operations subject to new requirements limiting discharges to 1/2 acre, 300 linear feet, and expressly prohibiting valley fills. (Doc. 63-5 at 2-3).  These three new requirements contained in NWP 21(b) did not apply to the grandfathered provision in NWP 21(a). (Doc. 63-5 at 2-3).

While the Corps' original decision document determined that the authorized activities would have minimal cumulative adverse effects on the impacted aquatic environments, Riverkeeper argued that certain language[2] in the decision document expressing the

---

[2] In support of its argument under the original decision document, Riverkeeper pointed to three specific statements:
> the new terms and conditions of this NWP, including the 1/2 acre and 300 linear foot limits, are **necessary** to ensure that this NWP authorizes only those activities that have minimal individual and cumulative adverse effects on the aquatic environment.
> * * *
> [The Corps] determined that the changes to NWP 21 are **necessary** to comply with the requirements of Section 404(e) of the Clean Water Act.
> * * *
> The substantial changes in the terms and conditions of the

5

importance of these three new requirements, contradicted the Corps' determination that NWP 21 as a whole, both NWP 21(a) and NWP 21(b), would have a minimal cumulative adverse aquatic effect. Riverkeeper made to this court before its appeal and to the Eleventh Circuit, the argument that it "was arbitrary and capricious for the Corps to conclude, on the one hand, that the new stream-fill limits contained in paragraph (b) of NWP 21 are necessary to avoid significant environmental effects, but on the other, to decline to apply them to projects reauthorized pursuant to paragraph (a)." *Black Warrior Riverkeeper*, 781 F.3d at 1288.

Under the original decision document, this court rejected Riverkeeper's recasting of the Corps' determination, finding "references to 'changes to NWP 21' and its 'new terms and conditions' logically mean **all** changes and **all** new terms and conditions." *Black Warrior Riverkeeper*, 23 F. Supp. 3d at 1389. While the Eleventh Circuit reversed this court's merits determination for the singular purpose of correcting the Corps' math error and recalculating the aquatic effect, the Court agreed with this court insofar as "[t]he Corps' analysis . . . was based on a holistic account of **all** of the terms and requirements stipulated in NWP 21, including compensatory mitigation and

---

   reissued NWP 21 will ensure that the activities authorized
   by this NWP result in minimal individual and cumulative
   adverse effects on the aquatic environment.
(Doc. 46 at 25-26) (quoting the original decision document at 8, 21, 23).

individual reverification." *Black Warrior Riverkeeper*, 781 F.3d at 1289 (emphasis added).

Now, Riverkeeper raises the same alleged "differential treatment error" argument based on language in the Revised Decision Document that is indistinguishably similar to the language it attempted to recast in the original decision document. Reviewing these statements in their proper context, from pages 6-7 of the Revised Decision Document:

> We have added the 1/2-acre limit, and the 300 linear foot limit for the loss of stream bed, to make this NWP consistent with many of the other NWPs (e.g., NWPs 29, 39, 40, 42, 43, 44, and 51). We have also added a prohibition against using this NWP to authorize discharges of dredged or fill material into waters of the United States to construct valley fills. Such limits are necessary to constrain the adverse effects to the aquatic environment to ensure compliance with the statutory requirement that general permits, including NWPs, may only authorize those activities that have minimal individual and cumulative adverse effects on the aquatic environment. We do not believe it is efficient to rely on the pre-construction notification process alone to ensure minimal adverse environmental effects. Many other NWPs use a combination of acreage and/or linear foot limits and pre-construction notification requirements to ensure compliance with Section 404(e) of the Clean Water Act, as well as 33 CFR 322.2(f) and 33 CFR 323.2(h).

From page 7 of the Revised Decision Document:

> Previous versions of NWP 21 did not have any acreage or linear foot limits, and relied solely on the pre-construction notification review process and permit conditions to reduce adverse effects on the aquatic environment to satisfy the minimal adverse environmental effects requirement for general permits. We believe that approach is no longer appropriate for future NWP 21 activities because of the inconsistency with other NWPs, the possibility that larger losses of waters of the United States might be authorized, and the difficulty of documenting minimal adverse effect determinations for losses of aquatic resource area and functions that exceed those

allowed in other NWPs. We note that part of the basis for the earlier approach was the environmental review that occurs in connection with obtaining a SMCRA permit, and that the SMCRA regulations related to stream protection have changed since the previous NWP 21 was issued. The new acreage and linear foot limits will ensure that this NWP contributes no more than minimal individual and cumulative adverse effects to the aquatic environment, by limiting the amount of waters of the United States that can be filled by each NWP 21 activity.

From page 20 of the Revised Decision Document:

The 300 linear foot limit for losses of stream bed is generally necessary to ensure that NWP 21 authorizes only those activities that result in minimal adverse effects on the aquatic environment. However, that 300 linear foot limit may be waived by the district engineer if the proposed activity involves filling or excavating intermittent or ephemeral stream beds, and the district engineer determines, in writing, that that activity will result in minimal individual and cumulative adverse effects on the aquatic environment. Agency coordination for proposed losses of greater than 300 linear feet of intermittent or ephemeral stream bed is intended to provide information that will assist the district engineer in making his or her minimal adverse effects determination.

From page 21 of the Revised Decision Document:

We have added a definition of the term "valley fill" to the text of this NWP. While fewer surface coal mining activities involving discharges of dredged or fill material into waters of the United States would be authorized by NWP 21 when compared to previous issued versions of this NWP, the new terms and conditions of this NWP, including the 1/2-acre and 300 linear foot limits, are necessary to ensure that this NWP authorizes only those activities that have minimal individual and cumulative adverse effects on the aquatic environment. If the construction of larger sediment ponds does not qualify for NWP 21 authorization, activities maybe authorized by individual permits or applicable regional general permits.

From page 23 of the Revised Decision Document:

The Corps has determined that the changes to NWP 21 are necessary to comply with the requirements of Section 404(e) of the Clean Water Act. We have modified Option 2 by authorizing activities verified under the 2007 NWP 21 (see paragraph (a) of NWP 21), to provide an equitable transition to the new

> limits in NWP 21 and reduce burdens on the regulated public. The authority for the district engineer to waive the linear foot limit for losses of intermittent and ephemeral streams if the impacts are not more than minimal is also intended to minimize regulatory burden.

While Riverkeeper interprets these statements to conclude that the Corps differentially treated in its analysis NWP 21(a) and NWP 21(b), the Corps maintains that these statements, along with the entire Revised Decision Document, demonstrate that the minimal cumulative effects determination was for the **entirety** of NWP 21, analyzing the cumulative impacts of both NWP 21(a) and NWP 21(b) together as a "single new nationwide permit **as a whole**." (Doc. 97 at 22-23) (emphasis added). Consistent with this court's earlier interpretation of the Corps' original decision document, under the Revised Decision Document these similar references "logically mean **all** changes and **all** new terms and conditions, or the Corps would specify which change." *Black Warrior Riverkeeper*, 23 F. Supp. 3d at 1389. In addition to the reasons explained in this court's prior decision, this court offers the following additional reasons for upholding NWP 21 under the CWA and NEPA as neither arbitrary nor capricious.

    A.   *Auer* **deference**

Generally, "courts must give deference to an agency's reasonable interpretation of its own regulations." *Sierra Club, Inc. v. Leavitt*, 488 F.3d 904, 912 (11th Cir. 2007); see *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945). Courts must give

"deference to an agency's interpretation of its own ambiguous regulation, even when that interpretation is advanced in a legal brief. *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166 (2012) (citing *Auer v. Robbins*, 519 U.S. 452, 462 (1997)). "[D]eference is likewise unwarranted when there is reason to suspect that the agency's interpretation does not reflect the agency's fair and considered judgment on the matter in question . . . [such as] when the agency's interpretation conflicts with a prior interpretation, or when it appears that the interpretation is nothing more than a convenient litigating position, or a post hoc rationalization advanced by an agency seeking to defend past agency action against attack." *Id.* at 2166 (quotes omitted).

While Riverkeeper dismisses the Corps' "whole permit" theory as an untenable and disingenuous "post-hoc litigation position" (Doc. 100 at 7), the court must give deference to the Corps' reasonable interpretation of ambiguities in the Corps' own Revised Decision Document.[3] Specifically, the Corps reasonably interprets its finding that stream limits are "necessary," to logically mean

---

[3] For purposes of deference under *Auer*, the Corps' Revised Decision Document is a "regulation." See *Sierra Club, Inc. v. Bostick*, 787 F.3d 1043, 1054 (10th Cir. 2015); *Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs*, 746 F.3d 698, 708-09, n.3 (6th Cir. 2014); *Snoqualmie Valley Pres. Alliance v. U.S. Army Corps of Eng'rs*, 683 F.3d 1155, 1164 (9th Cir. 2012). Additionally, the Revised Decision Document was issued as part of the general permitting process required by statute, 33 U.S.C. § 1344, it states the agency's official position, and it was published in the Federal Register.

"necessary for the entire NWP 21 permit as a whole," not just for NWP 21(b). (Doc. 97 at 26-27). While the Corps' interpretation "comes to us in the form of a legal brief . . . that does not . . . make it unworthy of deference." *Auer*, 519 U.S. at 462. Furthermore, the Corps' consistent "whole permit" interpretation in **both** the original decision document and **now** the Revised Decision Document alleviates any possible concern that its position is a post hoc rationalization or convenient litigation strategy. Therefore, giving deference to the Corps' "whole permit" interpretation, the Corps' determination under the CWA or NEPA for NWP 21 was neither arbitrary nor capricious.

### B.  Hard look review

Even if no deference is given to the Corps' interpretation, the Corps' determination for NWP 21 under the CWA and NEPA took a hard look at the entire record.

Under the APA, an agency action may be set aside when it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "[T]he generally applicable standards of § 706 require the reviewing court to engage in a substantial inquiry . . . a thorough, probing, in-depth review." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971). Looking at the whole administrative record, a "court will overturn an agency's decision as arbitrary and capricious under 'hard look' review if it

suffers from one of the following: (1) the decision does not rely on the factors that Congress intended the agency to consider; (2) the agency failed entirely to consider an important aspect of the problem; (3) the agency offers an explanation which runs counter to the evidence; or (4) the decision is so implausible that it cannot be the result of differing viewpoints or the result of agency expertise." *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1216 (11th Cir. 2002).

The Corps' determination relied on the data and on the actual use of NWP 21(a) and NWP 21(b) during the period from March 19, 2012 to March 12, 2015. (Doc. 90-2 at 14-15; Doc. 97 at 23). For NWP 21(a), "the Corps determined that 88 NWP 21(a) verifications were issued, authorizing impacts to approximately 503 acres and 280,700 linear feet of waters of the United States . . . [and] [u]sing the current trend for NWP 21(b), approximately 35 activities could be authorized over a five year period until NWP(b) expires, resulting in impacts to approximately 6.5 acres and 17,000 linear feet of waters of the United States." (Doc. 90-2 at 14-15). For NWP 21(a) the Corps "required approximately 653 acres and 377,300 linear feet of compensatory mitigation to offset those impacts." (Doc. 90-2 at 14). For NWP 21(b) the Corps approximated "11.5 acres and 21,000 linear feet of compensatory mitigation would be required to offset those impacts." (Doc. 90-2 at 15). Looking at the effects of NWP 21(a) and NWP 21(b) as a whole permit, the

Corps concluded that even "[a]fter considering the revised estimates provided above in accordance with 40 C.F.R. § 230.7(b)(3) [and required on remand], despite the higher impact and compensatory mitigation amounts expected to occur across the country during the five year period this NWP is in effect, the Corps has determined that the individual and cumulative adverse effects on the aquatic environment resulting from the activities authorized by this NWP **will be minimal**." (Doc. 90-2 at 17) (emphasis added). This conclusion by the Corps is reasonable and the product of reasoned decision making whereby the Corps "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation omitted).

While the Corps provides a reasoned decision for its determination based on its recalculated figures, Riverkeeper argues that the dissimilar treatment of NWP 21(a) and NWP 21(b) indicates that it is arbitrary and capricious. (Doc. 94 at 13). See *Yetman v. Garvey*, 261 F.3d 664, 669 (7th Cir. 2001) ("A long line of precedent has established that an agency action is considered arbitrary when the agency has offered insufficient reasons for treating similar situations differently"). While Riverkeeper concludes that the three new requirements of NWP 21(b) are

exclusive prerequisites for a finding of minimal cumulative impacts, the record indicates that the Corps also relied on the compensatory mitigation requirements in both NWP 21(a) and NWP 21(b) for its conclusions. (Doc. 92-2 at 16-17; Doc. 97 at 26). More importantly, Riverkeeper overlooks the fact that under NWP 21(b) the "300 linear foot limit **may be waived** by the district engineer if the proposed activity involves filling or excavating intermittent or ephemeral stream beds, and the district engineer determines, in writing, that that activity will result in minimal individual and cumulative adverse effects on the aquatic environment." (Doc. 90-1 at 20) (emphasis added). As the Corps explains in its Revised Decision Document (Doc. 90-1 at 11) and briefing (Doc. 97 at 28-29), the discretion by the district engineer to tailor the conditions and requirements on a regional or individual basis ensures minimal adverse aquatic effects. While the three new requirements in NWP 21(b) were certainly a component part of the Corps determination, it did not **exclusively** rely on those requirements, but rather made its cumulative effects determination based on NWP 21 as a whole. Therefore, upon reviewing the entire administrative record,[4] the Corps'

---

[4] To bolster the Corps' findings, Intervenor-Defendants attach an outside expert engineer's affidavit and supporting documentation (Doc. 99; Doc. 99-1; Doc. 99-2; Doc. 99-3); however this court may **only** review the Corps' findings based on the whole administrative record. See *Citizens to Pres. Overton Park, Inc.*, 401 U.S. at 403 (finding litigation affidavits are not part of the "whole record" and are therefore an inadequate basis for

determination was neither arbitrary nor capricious under the CWA and NEPA because it "took a 'hard look' at the environmental consequences of the proposed action." *Sierra Club*, 295 F.3d at 1216.

C.    **The *Chevron* barrier**

Finally, under the CWA, Congress delegated the task of issuing general permits on a nationwide basis to the Secretary of the Army, acting through the Chief of Engineers. 33 U.S.C. § 1344(d)-(e). While Congress clearly defined certain aspects of this permit authority, such as limiting general permits to a period of five years, 33 U.S.C. § 1344(e)(2), Congress **expressly** committed determination that dredging or filling activities "will cause only minimal adverse environmental impacts" to the secretary's discretion. 33 U.S.C. § 1344(e)(1). Acting within the scope of its discretion, the Corps has promulgated regulations to guide and define its minimally adverse effects determination specifically for aquatic discharges of dredged or fill materials. See Restrictions on Discharge, 40 C.F.R. § 230.10. While these regulations do not prevent the Corps from having additional procedural and substantive requirements, "all requirements in § 230.10 must be met." *Id.*

"If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation."

---

review).

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984). "[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 665 (2007) (quoting *Chevron*, 467 U.S. at 842-43). "Judges are not experts in the field, and are not part of either political branch of the Government . . . [t]he responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones: Our Constitution vests such responsibilities in the political branches." *Teper v. Miller*, 82 F.3d 989, 998 (11th Cir. 1996) (quoting *Chevron*, 467 U.S. at 866).

Riverkeeper argues that while in pre-2012 general permits the Corps may have relied on lesser permit requirements to find minimal cumulative adverse effects, now such lesser requirements are "no longer appropriate." (Doc. 100 at 9) (quoting Doc. 90-1 at 6-7). In essence, Riverkeeper interprets the Revised Decision Document to require all general permits post-2012 to include the three new requirements in NWP 21(b) for all discharges in order for the Corps to make a minimal cumulative effects determination.[5]  Such a

---

[5] Nowhere does Riverkeeper argue that the repeat inclusion of these three new requirements in general permits post-2012 constitute a rule adopted outside of notice-and-comment rulemaking. "[D]eference under *Chevron* . . . does not necessarily require an agency's exercise of express notice-and-comment

reading of the Revised Decision Document would require this court to effectively graft into the Corps' regulations the three new requirements of NWP 21(b) as hard fast prerequisites for a minimally adverse effects determination by the Corps. The Corps current regulations guiding and defining its minimally adverse effects determination, which do **not** contain these three new requirements, are "a permissible construction of the statute." *Chevron*, 467 U.S. at 843. Additionally, the Corps' decision to "provide an equitable transition to the new limits in NWP 21 and reduce burdens on the regulated public" (Doc. 90-1 at 16) is not only within its discretion as an agency, but entirely consistent with agency regulations that require the Corps to consider numerous factors, including economic and public interest considerations. See General Policies for Evaluating Permit Applications, 33 C.F.R. § 320.4. An intrusion on those regulations by this court would require the court to entirely ignore *Chevron*, which "importantly guards against the Judiciary arrogating to itself policymaking

---

rulemaking power." *Edelman v. Lynchburg College*, 535 U.S. 106, 114 (2002). For example, "[t]he interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question over a long period of time all indicate that *Chevron* provides the appropriate legal lens through which to view the legality of the Agency interpretation." *Barnhart v. Walton*, 535 U.S. 212, 222 (2002); see *NationsBank of N. Carolina, N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 254-58 (1995). Here however, the Corps has inconsistently, and for a short period of time, applied these three requirements to general permits.

properly left, under the separation of powers, to the Executive." *City of Arlington, Tex. v. F.C.C.*, 133 S. Ct. 1863, 1886 (2013) (Roberts, C.J., dissenting). Therefore, as a reasonable exercise of its discretion in determining minimal adverse effects, the Corps' issuance of NWP 21 is neither arbitrary nor capricious under the CWA or NEPA.

## CONCLUSION

For the reasons detailed above, the court will by separate order deny plaintiffs' motion for summary judgment and grant defendants' and intervenor-defendants' motions for summary judgment.

DONE this 20th day of October, 2015.

_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE